UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x

ALEXANDER WELLER,

              Plaintiff,        **MEMORANDUM & ORDER**
                                23-CV-8056 (EK)(RML)

       -against-

NYU LANGONE HEALTH SYSTEM, et al.,

              Defendants.

-----------------------------------x

ERIC KOMITEE, United States District Judge:

        Plaintiff Alexander Weller worked as a physician in the NYU Langone Health System ("NYU Langone"). Dr. Weller alleges that he was fired in retaliation for having reported a violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"). His belief that NYU Langone violated EMTALA, however, was incorrect. The statute regulates a hospital's right to "transfer" an individual who presents with an unstabilized emergency condition, as well as a receiving hospital's right to decline such a transfer. But a transfer, within the meaning of EMTALA, occurs when an individual is moved "outside a hospital's facilities" — and not, as was contemplated here, from one NYU Langone facility to another operated by that same hospital.

        Because Dr. Weller has not plausibly pled an actual EMTALA violation, and because EMTALA's whistleblower protections

do not extend to those who report what they reasonably, but inaccurately, believe to constitute a violation, his complaint must be dismissed.

## I.    Background

The following facts are drawn from the third amended complaint and are presumed true for purposes of this action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  Dr. Weller began working as a part-time hospitalist physician at NYU Langone Brooklyn Hospital ("NYU Brooklyn") in January 2023.[1] Third Amended Complaint ("TAC") ¶ 16, ECF No. 33.  Dr. Weller worked four to eight shifts per month.  *Id.* ¶ 19.  His responsibilities included admitting, caring for, and discharging adult medical patients.  *Id.*

In July of 2023, NYU Brooklyn's Medical Care Director circulated a new policy regarding patient admissions from the emergency department.  *Id.* ¶ 32.  Thereafter, Dr. Weller complained to Dr. Kevin Eaton — chairperson of the Department of Medicine at NYU Brooklyn, and a defendant here — that the policy was "hazardous and imprudent."  *Id.* ¶¶ 9, 33.  One day that summer, Dr. Weller assessed an elderly patient who was suffering

---

[1] Though not defined in the complaint, a hospitalist is a physician "who specializes in providing and managing the care and treatment of hospitalized patients."  *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/hospitalist (last accessed June 23, 2025); *accord Ofoche v. Apogee Med. Grp., Virginia, P.C.*, 815 F. App'x 690, 691 n.1 (4th Cir. 2020).

from complications of blood cancer. *Id.* ¶ 35. That patient had presented to the emergency department at NYU Brooklyn after a fall, and was admitted to a general medicine ward. *Id.* After inheriting the patient from another hospitalist, Dr. Weller reviewed the patient's medical record. *Id.* ¶ 36. Dr. Weller expressed concerns to another physician that the patient's care "deviated from" national standards for patients with blood cancer. *Id.*

After "fruitless" discussions with this physician, Dr. Weller reached out to the NYU Langone transfer center. *Id.* ¶¶ 37-38. An oncologist at NYU Langone Tisch ("NYU Tisch") in Manhattan accepted the transfer. *Id.* ¶ 38. In the subsequent hours, however, Dr. Eaton and administrators at NYU Langone canceled the transfer. *Id.* ¶ 39. The patient remained at NYU Brooklyn. *Id.* Dr. Weller alleges that the patient's condition deteriorated thereafter, *id.* ¶ 42, though his allegations concerning the patient's subsequent demise have shifted meaningfully over time.[2]

---

[2] Dr. Weller initially pled that the patient was not transferred and "died shortly thereafter." First Am. Compl. ¶ 42, ECF No. 14. His counsel reiterated this assertion at oral argument. Transcript of Proceedings on Dec. 20, 2024 ("Oral Argument Transcript") 33:19-34:11, ECF No. 22 ("What happened, Your Honor, is that it was the order, the request for transfer was cancelled and the patient died . . . [w]ithin days."). Dr. Weller then amended his complaint to allege more facts related to the patient's treatment and explained that after denial of the transfer, the patient died "a few days later (less than five days)." Second Am. Compl. ¶ 42, ECF No. 23.

In response, defendants filed a letter explaining that the patient was released from the hospital alive, twenty-one days after admission and fifteen

On July 14, Dr. Weller informed Dr. Eaton that he believed the cancellation violated EMTALA. *Id.* ¶ 43. He then sent Dr. Eaton the statute as well as a judicial opinion on EMTALA. *Id.* Dr. Eaton responded, explaining that Dr. Weller had failed to follow the hospital's transfer process because he had not obtained certain approvals. *Id.* ¶ 44. On July 21, Dr. Weller met with Dr. Joseph Weisstuch — the Chief Medical Officer at NYU Brooklyn — and another physician, and again complained that NYU Langone had violated EMTALA. *Id.* ¶¶ 11, 46. The next day, Dr. Weller made a complaint to the Centers for Medicare and Medicaid services, copying New York state officials, alleging that NYU Langone had violated EMTALA. *Id.* ¶ 48. On August 9, Dr. Weller informed Dr. Weisstuch of this complaint. *Id.* ¶ 50. Two days later, Dr. Eaton terminated Dr. Weller's employment. *Id.* ¶ 52.

Dr. Weller now brings suit against NYU Langone, NYU Langone Hospital Long Island, NYU Grossman School of Medicine (which operates NYU Langone), New York University, and Drs. Eaton and Weisstuch. He alleges a violation of EMTALA's

---

days after the transfer request. Barry Ltr. 1-2, ECF No. 27. Defendants indicated that they had shared medical records and the patient's obituary with Dr. Weller, indicating that she was alive at the time this action was commenced — several *months* after the cancellation of the alleged transfer request. *Id.* Soon thereafter, Dr. Weller filed another amended complaint that simply alleged upon information and belief that "the patient was discharged to hospice." TAC ¶ 42. These allegations formed the basis of a pending motion for sanctions pursuant to Rule 11. Mot. for Sanctions, ECF No. 37.

whistleblower protection provision and also brings five New York state law claims.

Defendants have moved to dismiss all claims.

## II. Discussion

### A. Legal Standard

To overcome a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 544, 570 (2007). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).[3] The Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999).

### B. Plaintiff Has Not Plausibly Pled an EMTALA Violation

#### 1. EMTALA's Requirements

Congress enacted EMTALA in 1986. EMTALA combats "patient dumping, the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring

---

[3] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

them before emergency conditions are stabilized." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999). To this end, EMTALA imposes obligations on hospitals that participate in Medicare and have emergency departments. First, these hospitals must provide an "appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). Second, hospitals generally must "stabilize" the emergency medical condition before transferring the patient "outside [the] hospital's facilities." *See id.* §§ 1395dd(b) and (c) (discussing stabilization and restrictions on transfer); *id.* § 1395dd(e)(4) (defining transfer).

EMTALA also addresses "reverse dumping," which is perhaps more pertinent to Dr. Weller's contentions. Reverse dumping occurs when a hospital refuses to accept a transfer of a patient requiring its "specialized capabilities." *Id.* § 1395dd(g). The statute provides that a "participating hospital" with such capabilities "shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual." *Id.*; *see St. Anthony Hosp.*

*v. U.S. Dep't of Health & Hum. Servs.*, 309 F.3d 680, 686 (10th Cir. 2002).[4]

EMTALA provides patients a private right of action for violations. In addition, the statute includes certain whistleblower protections:

> A participating hospital may not penalize or take adverse action [1] against a qualified medical person . . . or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or [2] against any hospital employee because the employee reports a violation of a requirement of this section.

42 U.S.C. § 1395dd(i). Dr. Weller seeks protection under the second clause. *See* TAC ¶ 61.[5] The first clause is inapposite, as Dr. Weller does not allege that he "refuse[d] to authorize" any transfer.

2. Dr. Weller Has Not Alleged a Contemplated Transfer

Dr. Weller contends that the decision to cancel the patient's transfer from NYU Brooklyn to NYU Tisch constituted a refusal to accept a transfer by a hospital with specialized capabilities and thus violated EMTALA. TAC ¶ 62. But Dr. Weller has not plausibly alleged that NYU Brooklyn and NYU Tisch are separate hospitals, as is necessary to establish that the

---

[4] *St. Anthony* is the case that Dr. Weller sent to Dr. Eaton along with the text of EMTALA after their meeting on July 14. *See* TAC ¶ 43.

[5] Defendants do not contest that Dr. Weller is a "hospital employee," notwithstanding that his employment was part time and *per diem*. *See* TAC ¶ 16.

decision concerned a "transfer" under EMTALA.  And the statute does not cover movement within a hospital.  Accordingly, Dr. Weller has not plausibly alleged that he "report[ed] a violation" of EMTALA.

EMTALA defines a "transfer" as:

[T]he movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

42 U.S.C. § 1395dd(e)(4).

The key issue, then, is whether the proposed movement of a patient from NYU Brooklyn to NYU Tisch was one "outside a hospital's facilities."  EMTALA does not separately define "hospital."[6]  However, "[a]s an amendment to the Social Security Act, EMTALA incorporates the Act's definition of a 'hospital.'" *Rodriguez v. Am. Int'l Ins. Co. of Puerto Rico*, 402 F.3d 45, 48 (1st Cir. 2005); *accord Emergency Health Ctr. at Willowbrook, L.L.C. v. UnitedHealthcare of Texas, Inc.*, 892 F. Supp. 2d 847, 852 (S.D. Tex. 2012).  This is consistent with established rules of statutory construction.  "Courts presume that words and provisions used in the original act were used in their same

---

[6] EMTALA defines a "participating hospital" as a "hospital that has entered into a [Medicare] provider agreement."  42 U.S.C. § 1395dd(e)(2). This does not, of course, state explicitly what a hospital is.

sense in an amendment."  1A Sutherland Statutory Construction § 22:31 (8th ed.).[7]

The Medicare Act added the Social Security Act's original definition of "hospital" in 1965.  Social Security Amendments (Medicare Act) of 1965, Pub. L. No. 89-97, § 1861(e), 79 Stat. 286, 314-315 (codified as amended at 42 U.S.C. § 1395x(e)).  Under that provision, a "hospital" is an "institution" that engages in specified medical services.  42 U.S.C. § 1395x(e).  Other provisions in the Social Security Act make it clear that a "hospital" can "encompass institutions with multiple campuses and facilities."  *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1165 (D.C. Cir. 2015).  Indeed, this conclusion emerges directly from EMTALA's definition of "transfer," which speaks to movement "outside a hospital's facilities."  42 U.S.C. § 1395dd(e)(4).  The use of the singular possessive — "hospital's" — to modify "facilities," plural, indicates that a single hospital can subsume multiple facilities.

Additional support for this proposition appears elsewhere in the Social Security Act.  One provision refers to

---

[7] Indeed, EMTALA broadened the Social Security Act's definition of "hospital" slightly, in a manner that confirms the applicability of that definition.  EMTALA established that the definition "*includes* a . . . critical access hospital . . . and a rural emergency hospital."  *Id.* § 1395dd(e)(5) (emphasis added).  Those two references — not relevant here — extended EMTALA's protection to certain hospitals excluded from the Social Security Act's definition of "hospital."  *See id.* §§ 1395x(mm)(1), 1395x(kkk)(2).

the number of beds "only in the facilities on the *main campus* of the hospital." *Id.* § 1395nn(h)(7)(B)(iv) (emphasis added); *see also id.* § 1395nn(i)(3)(D) ("Any increase in the number of operating rooms . . . may only occur in facilities on the *main campus* of the applicable hospital.") (emphasis added); *id.* § 1395g(e)(4) ("*A hospital* created by the merger or consolidation of *2 or more hospitals or hospital campuses* shall be eligible to receive periodic interim payment . . . .") (emphasis added). Thus, a single hospital can subsume multiple campuses. Such hospitals "often form as the result of a hospital merger or joint venture." *Anna Jacques*, 797 F.3d at 1159.[8]

   Dr. Weller's complaint and public documents make clear that NYU Langone is an institution with multiple campuses. Dr. Weller alleges that NYU Langone is a "private hospital system," and that both NYU Brooklyn and NYU Tisch are part of that system. TAC ¶¶ 7, 39, 41. In *Anna Jacques*, the D.C. Circuit

---

[8] We recognize that the word "hospital" is also used in a more limited fashion in colloquial conversation. One noteworthy example of such a usage comes from the inimitable Leslie Nielsen:

**Nielsen (as the doctor on board a commercial airliner):** You'd better tell the Captain. We've got to land as soon as we can. This woman has to be gotten to a hospital.

**Julie Hagerty (as the flight attendant):** A hospital? What is it?

**Nielsen:** *It's a big building with patients.* But that's not important right now. Tell the Captain I must speak to him.

*Airplane!*, at 37:58 (Paramount Pictures 1980) (emphasis added).

held that a hospital organization in southeastern Massachusetts formed via the merger of three separate hospitals was one "hospital" for purposes of the Medicare Act.  *Anna Jacques*, 797 F.3d at 1158-59, 64-65.[9]  There too, the court relied on the fact the campuses "operate[d] as a unified hospital."  *Id.* at 1162. And while not dispositive here, the fact that NYU Langone operated under a single Medicare provider agreement only serves to reinforce this conclusion.  *See id.* at 1164-65.[10]

Against this reading and precedent, Dr. Weller has not plausibly alleged that NYU Brooklyn and NYU Tisch are different hospitals.  After oral argument in December of 2024, Dr. Weller amended his complaint to add an allegation that the two facilities had separate Medicare provider numbers and were separately licensed and approved by the New York State Department of Health.  *See* Second Am. Compl. ¶ 18 & n.2, ECF No. 23.  Soon thereafter, however, Dr. Weller re-amended his complaint to remove these allegations — perhaps because public

---

[9] While *Anna Jacques* concerned the calculation of Medicare's wage index, 42 U.S.C. § 1395ww(d)(3)(E)(i), it is relevant here, too, given the "presumption that a given term is used to mean the same thing throughout a statute."  *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

[10] Courts "may take judicial notice of documents from official government websites."  *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023); *accord Wandel v. Gao*, 590 F. Supp. 3d 630, 636 n.4 (S.D.N.Y. 2022).  NYU Langone operated under one Medicare provider agreement at the time of Dr. Weller's employment.  *See* Ctrs. for Medicare & Medicaid Servs., *Q2 2023 Provider of Services File – Hospital & Non-Hospital Facilities* (available by searching for "NYU Langone" at https://data.cms.gov/provider-characteristics/hospitals-and-other-facilities/provider-of-services-file-hospital-non-hospital-facilities/data/q2-2023) (last accessed June 30, 2025).

records reveal them to be false.[11]  The operative complaint now
alleges only that "[u]pon information and belief," NYU Tisch and
NYU Brooklyn are "distinct hospitals."  TAC ¶ 18.  But this
constitutes a legal conclusion masquerading as a factual
conclusion and cannot support Dr. Weller's claim.  *Smith v. Loc.
819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002); *see
Twombly*, 550 U.S. at 555.  Finally, Dr. Weller's allegation that
NYU Langone has one "centralized transfer center" further
supports that NYU Tisch and NYU Brooklyn are not distinct
hospitals. TAC ¶ 39.

Because NYU Brooklyn and NYU Tisch are one hospital,
Dr. Weller has alleged no contemplated "movement" "outside of a
hospital's facilities" that could have violated EMTALA.  42
U.S.C. § 1395dd(e)(4).  At most, the patient would have been
moved between two of NYU Langone's facilities.

That EMTALA does not cover this movement makes sense.
Dr. Weller's complaint reads most naturally as a disagreement
about how a patient was treated by physicians within NYU
Langone.[12]  Extending EMTALA's reach to transfers among a single

---

[11] The Court takes judicial notice that the campuses share a New York
State Operating Certificate.  *See Rynasko*, 63 F.4th at 191; N.Y. State Dep't
of Health, *Facilities Sharing Operating Certificate 7002053H*,
https://profiles.health.ny.gov/hospital/opcert/7002053H (last accessed June
30, 2025).

[12] At times, Dr. Weller's argument seems to be that NYU Brooklyn itself
violated EMTALA by not transferring the patient to another hospital.  *See,
e.g.*, Oral Argument Transcript 26:5-26:7 ("There's a duty on both sides.

hospital's facilities would risk turning EMTALA into a "federal medical malpractice statute" — which it is not. *Brenord v. Cath. Med. Ctr. of Brooklyn & Queens, Inc.*, 133 F. Supp. 2d 179, 185 (E.D.N.Y. 2001). EMTALA instead "fill[s] a lacuna in traditional state tort law by imposing on hospitals a legal duty . . . to provide emergency care to all." *Hardy*, 164 F.3d at 792-93; *see also Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) ("[EMTALA's] core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat."). The prudence of NYU's decision to treat the patient at its Brooklyn

---

There's a duty to send . . . or transfer and there's a duty to receive."); Pl.'s Opp. Br. 12, ECF No. 19 ("NYU Langone Brooklyn Hospital had a duty to transfer the patient . . . ."). This argument fails for similar reasons: EMTALA does not cover transfers between a hospital's facilities. Furthermore, EMTALA "does not impose any positive obligation on a covered hospital to transfer a critical patient under particular circumstances to obtain stabilization at another hospital." *Fraticelli-Torres v. Hosp. Hermanos*, 300 F. App'x 1, 7 (1st Cir. 2008). Rather, it "restricts the conditions under which a hospital may transfer an unstabilized critical patient." *Id.* Finally, to the extent Dr. Weller's theory is that NYU Brooklyn discharged the patient before she was stabilized, that argument fails, too. That view presupposes that EMTALA's protections extend beyond a hospital's decision to admit a patient — a minority view among the courts addressing the question. *See Cooper v. City of New York*, No. 14-CV-3698, 2016 WL 4491719, at *3 (E.D.N.Y. Aug. 25, 2016). Even assuming, *arguendo*, that EMTALA's protections did continue in that way, the operative complaint does not sufficiently allege facts about the patient's treatment and discharge. Under EMTALA, a patient is "stabilized" when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B). The complaint only alleges that "[u]pon information and belief the patient was discharged to hospice." TAC ¶ 42. But the complaint does not allege when the patient was discharged, or set forth any factual content sufficient to establish that the patient's emergency medical conditions were not stabilized at the time of discharge.

campus instead of its Manhattan campus is thus one properly left for state law.

## C.   **EMTALA Does Not Protect Allegations Absent an Actual Violation**

Dr. Weller argues that even if EMTALA did not cover the canceled movement, the statute's whistleblower protections barred his termination because he *believed*, reasonably and in good faith, that it did.  The assertion that EMTALA protects such reasonable (but inaccurate) reporting has been adopted by one circuit and several district courts.  But it is inconsistent with the statute's text, and Dr. Weller therefore cannot prevail on this basis.

The Third Circuit reads EMTALA's whistleblower protections to cover reports made "under a good faith, reasonable belief that a violation existed."  *Gillispie v. RegionalCare Hosp. Partners Inc*, 892 F.3d 585, 593 (3d Cir. 2018).  But *Gillispie* did not meaningfully engage with EMTALA's text; instead, that court cited a case interpreting Title VII.  *Id.* (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996)).  Various district courts — though none within this Circuit — have followed the Third Circuit's holding.  Those cases cite *Gillispie* or each other, and (like *Gillispie*) do not engage with EMTALA's text.  *See Vanderlan v. Jackson HMA, LLC*, No. 23-CV-258, 2025 WL 1180077, at *2 (S.D. Miss. Apr. 23,

2025) (describing this view as "seem[ing] to be universally accepted," and citing three district court cases); *but cf. Nulph v. Houston Healthcare Sys., Inc.*, No. 21-CV-423, 2025 WL 410083, at *3 (M.D. Ga. Feb. 5, 2025) (assuming such a reading of EMTALA but expressing skepticism, and ultimately finding no violation).[13]

My reading of the provision in question and the statute as a whole lead me to conclude that, unlike Title VII and some other antiretaliation provisions, EMTALA's whistleblower provision does not include a "good faith" or "reasonableness" standard. Indeed, the comparison with other whistleblower provisions also supports this result.

1.   EMTALA's Text and Similar Whistleblower Provisions

As noted above, EMTALA's whistleblower provision protects hospital employees against adverse action for "report[ing] a violation of a requirement of this section." 42 U.S.C. § 1395dd(i). The text does not refer to "reasonable" or "good faith" reports. And "[i]t is not the province of the

---

[13] One of the district court cases that *Vanderlan* cites for its "universally accepted" premise is *Milner v. Team Health*, No. 19-CV-2041, 2020 WL 5658903 (N.D. Ala. Sept. 23, 2020). *Milner* parrots the "good faith, reasonable belief" language from another of these three district court cases, *id.* at *6, but does not appear actually to apply that standard. Instead, *Milner* appears to require an actual violation. *See id.* ("Furthermore, as the court has already found, Milner did not properly allege an EMTALA violation arising out of the 2017 incident. Accordingly, any claim under EMTALA's whistleblower protection provision fails to state a claim upon which relief can be granted.").

courts to add words to statutes that Congress has enacted."
*Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 331 (2d Cir. 2022).

"Atextual judicial supplementation is particularly inappropriate when Congress has shown that it knows how to adopt the omitted language or provision," as it has done here. *Lackey v. Stinnie*, 145 S. Ct. 659, 669–70 (2025). Congress has shown that if it wanted EMTALA's whistleblower protection to sweep more broadly, it knew how to do so. First, in a nearby provision to enforce civil penalties under EMTALA, Congress directed the Secretary, "[i]n considering *allegations of violations*," to consult with certain organizations. 42 U.S.C. § 1395dd(d)(3) (emphasis added).

Other federal whistleblower statutes explicitly lay out the more sweeping standard Dr. Weller seeks. One notable example is a whistleblower provision enacted by the *same Congress* that enacted EMTALA. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88–90 (1991) (repeatedly emphasizing fee-shifting statutes enacted in the same session while interpreting 42 U.S.C. § 1988, the 1976 statute under consideration). The Asbestos Hazard Emergency Response Act bars state and local educational agencies from discriminating against a person "in any way" for providing information "relating to a *potential* violation of this subchapter to any other person." 15 U.S.C.

§ 2651(a) (emphasis added). Elsewhere, the Seaman's Protection Act — enacted a few years before EMTALA — prohibits retaliation after a "seaman in *good faith* has reported [to federal officials] . . . that the seaman *believes* that a violation of [maritime law or regulation] has occurred." 46 U.S.C. § 2114(a)(1)(A) (emphasis added). And the Civil Service Reform Act of 1978 — enacted almost a decade before EMTALA — prohibits retaliation after certain "disclosure of information . . . which the employee or applicant *reasonably believes* evidences any violation of any law, rule, or regulation." 5 U.S.C. § 2302(b)(8)(A)(i) (emphasis added).

More recent statutes are similarly explicit. For example, the Federal Railroad Safety Act ("FRSA") protects, among other things, an "employee's lawful, *good faith* act done . . . to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee *reasonably believes* constitutes a violation of federal law." 49 U.S.C. § 20109(a)(1) (emphasis added). When legislators want to protect a putative whistleblower's erroneous, but good-faith, reporting, they clearly know how to extend that margin of error around the protection they enact.

2. Comparisons to Title VII Are Unavailing

17

Dr. Weller points to Title VII for his argument that EMTALA protects good-faith, reasonable reporting.  Pl.'s Opp. Br. 7, ECF No. 19; Pl.'s Ltr. Br. 1-3, ECF No. 32.  Title VII bars adverse action if an employee "has [1] opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Courts have read in a good faith or reasonableness standard to this first clause, even in the absence of statutory text.  *See, e.g.*, *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

Notably, the Supreme Court has never adopted such a reading.  *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 187 (2005) (Thomas, J., dissenting) ("Although this Court has never addressed the question, no Court of Appeals requires a complainant to show more than that he had a reasonable, good-faith belief that discrimination occurred to prevail on a retaliation claim.").  And the Second Circuit opinion that first adopted this reading of Title VII offers no methodological guidance that might be transferred to EMTALA.  *See Manoharan*, 842 F.2d at 593.

Other appellate courts adopting this reading relied largely on Title VII's remedial purpose.  For example, the Ninth

18

Circuit explained that "elimination of discrimination in employment is the purpose behind Title VII and the statute is entitled to a liberal interpretation." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978); *see also Parker v. Baltimore & Ohio R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981) ("[M]aking the protected nature of an employee's opposition to alleged discrimination depend on the ultimate resolution of his claim would be inconsistent with the remedial purposes of Title VII."); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1139 (5th Cir. Unit A Sept. 1981) (citing *Sias*).

The Supreme Court has since cautioned against using the sort of broad, remedial-purpose reasoning to expand a statute's coverage or narrow its exceptions. It is now "error" to treat "the proposition that remedial statutes should be interpreted in a liberal manner . . . as a substitute for a conclusion grounded in the statute's text and structure." *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014). After all, no statute pursues its ends "at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). And "almost every statute might be described as remedial in the sense that all statutes are designed to remedy some problem." *Waldburger*, 573 U.S. at 12; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The*

*Interpretation of Legal Texts* 364 (1st ed. 2012) ("Is any statute *not* remedial?").

When interpreting statutes, district courts are bound by the rules of construction as they are today.  And the Supreme Court's recent guidance on construction of so-called "remedial" statutes disfavors anything but a plain reading.  For example, "[u]ntil recently, it was a rule of statutory interpretation that a court should narrowly construe an exemption to the [Fair Labor Standards Act ('FLSA')] in order to effectuate the statute's remedial purpose."  *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 228 (2d Cir. 2018).  The Supreme Court rejected this rule in *Encino Motorcars v. Navarro*, instructing that these exceptions should be given their "fair reading" — regardless of purpose.  584 U.S. 79, 88-89 (2018); *see also id.* at 89 ("The narrow-construction principle relies on the flawed premise that the FLSA pursues its remedial purpose at all costs.").

Thus, Title VII provides no reason to depart from a plain reading of EMTALA's text and structure.

### 3.  Other Retaliation or Whistleblower Laws

Dr. Weller points to several other retaliation or whistleblower protection laws that protect employees even when the underlying conduct is not a violation.  Pl.'s Ltr. Br. 1, 3. None make for persuasive comparisons.  Some are anti-discrimination statutes — like the Americans with Disabilities

Act and Age Discrimination in Employment Act – which have long been interpreted in tandem with Title VII given the similarity of their retaliation provisions.  Both the ADA and ADEA include the same "practice made unlawful" language as Title VII.  *See* 42 U.S.C. § 12203(a) (ADA); 29 U.S.C. § 623(d) (ADEA).  The same issue plagues Dr. Weller's comparison to the Family and Medical Leave Act.  Pl.'s Ltr. Br. 1 n.1; *see* 29 U.S.C. § 2615(a)(2).

Other statutes Dr. Weller cites explicitly include words like "good faith" or "reasonably believe" and are therefore not analogous to EMTALA.  *See* Pl.'s Ltr. Br. 3 (citing FRSA); *supra* Section II(C)(1) (discussing FRSA); Pl.'s Ltr. Br. 3 (discussing the Sarbanes-Oxley Act, 15 U.S.C. § 7201 et seq.); 18 U.S.C. § 1514A(a)(1) (barring certain companies from taking adverse action against an employee who "provide[s] information, cause[s] information to be provided, or otherwise assist[s] in an investigation regarding any conduct which the employee *reasonably believes* constitutes a violation of [securities laws.]" (emphasis added)).

### III. Conclusion

For the reasons set forth above, the defendants' motion to dismiss Dr. Weller's EMTALA cause of action is granted.  Having dismissed the federal claim, I decline to exercise supplemental jurisdiction over the state-law claims. 28 U.S.C. § 1367(c); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39,

56 (2d Cir. 2004).[14]   The Clerk of Court is respectfully directed to close this case.


             SO ORDERED.



                            /s/ Eric Komitee
                            ERIC KOMITEE
                            United States District Judge


Dated:    June 30, 2025
          Brooklyn, New York

---

[14] Defendants' motion for sanctions, which is predicated primarily on the pleading of misleading or incorrect facts regarding the patient's treatment and death, is denied.  Though plaintiff's counsel's diligence has at times been wanting, it does not meet Rule 11's objective unreasonableness standard.  *See McCabe v. Lifetime Ent. Servs., LLC*, 761 F. App'x 38, 41 (2d Cir. 2019).  And even if the Court were to grant this motion, dismissal with prejudice of Dr. Weller's EMTALA claim, which is occurring here for merits-related reasons anyway, would be one available remedy.  *See Dodson v. Runyon*, 86 F.3d 37, 39 (2d Cir. 1996) ("The remedy of dismissal is pungent, rarely used, and conclusive.").